IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

KIMBERLY J. MUSIC,                      )      CASE NO. 1:19-CV-1976
                                        )
                 Plaintiff,             )
                                        )
        v.                              )
                                        )      MAGISTRATE JUDGE
                                        )      KATHLEEN B. BURKE
COMMISSIONER OF SOCIAL                  )
SECURITY ADMINISTRATION,                )
                                        )      **MEMORANDUM OPINION & ORDER**
                 Defendant.             )

Plaintiff Kimberly J. Music ("Music") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Commissioner") denying her application for

Disability Insurance Benefits ("DIB").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C.

§ 405(g).  This case is before the undersigned Magistrate Judge pursuant to the consent of the

parties.  Doc. 14.

For the reasons explained below, the Commissioner's decision is **AFFIRMED**.

## I. Procedural History

Music filed her application for DIB on May 18, 2015, alleging a disability onset date of

July 23, 2013.  Tr. 116, 301.  She alleged disability based on the following: fibromyalgia, muscle

spasms, asthma/allergies, and migraines.  Tr. 336.  After denials by the state agency initially (Tr.

185) and on reconsideration (Tr. 201), Music requested an administrative hearing (Tr. 214).  A

hearing was held before an Administrative Law Judge ("ALJ") on May 3, 2017, and a

supplemental hearing was held on July 16, 2018.  Tr. 134-171.  In his July 19, 2018, decision,

the ALJ determined that there are jobs that exist in significant numbers in the national economy

that Music can perform, i.e. she is not disabled.  Tr. 127-128.  Music requested review of the

ALJ's decision by the Appeals Council (Tr. 298) and, on July 16, 2019, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Music was born in 1968 and was 45 years old on her alleged onset date.  Tr. 127.  She has a two-year college degree and used to work as an x-ray technician.  Tr. 156.

### B. Relevant Medical Evidence

On July 29, 2013, Music visited the neurology department at University Hospitals and saw Dr. Tani, M.D., complaining of muscle spasms in her neck, left arm, and left leg causing involuntary movements for the past week.  Tr. 460-466.  The spasms were not painful, typically occurred at night, and lasted 1-2 minutes.  Tr. 460.  She had tried Baclofen, but it caused vomiting, confusion and sleepiness, and she had tried Tizanidine, which helped her sleep for about 4 hours, but then she experienced spasms again.  Tr. 460.

Music recounted her relevant medical history: she had been diagnosed with fibromyalgia two years prior after developing aching in her shoulders, hips, and thighs.  Tr. 460.  Cymbalta helped her symptoms.  Tr. 460.  She had also developed severe headaches at the back of her head, which caused vomiting.  Tr. 460.  She was put on Topamax and it helped her headaches. Tr. 460.  She stated that, two months prior, she had experienced severe fatigue and was found to be low in vitamin B12.  Tr. 460.  She had had three B12 shots and felt a little less tired.  Tr. 460. She had also had a normal CT scan of her head.  Tr. 460.  She stated that in the past few weeks her arms and legs felt very weak, "like rubber bands."  Tr. 460.  She felt wobbly and shaky and had almost fallen once.  Tr. 460.  She also had numbness in her lower face and a painful pins-and-needles sensation in both feet for the past two years.  Tr. 460-461.  Her active problem list

included fatigue, fibromyalgia, osteoarthritis in multiple sites, shoulder tendonitis, tingling, and vitamin B12 deficiency. Tr. 461.

Upon exam, she was alert and interactive. Tr. 464. She had a normal motor exam, including normal muscle bulk, tone and strength. Tr. 464. She had an abnormal sensory exam, with decreased sense of touch bilaterally on her lower face and decreased pinprick on the left side of her lower face; decreased pinprick throughout the left side of her back and both legs; and painfulness upon light touch in both feet, especially the left. Tr. 464. Her coordination was normal and her gait was wide-based, her tandem gait was unsteady, and she could hop on her right foot but not her left. Tr. 464. She was able to walk on her heels and toes. Tr. 464. She was assessed with numbness, involuntary movements, and ataxia. Tr. 465. Dr. Tani suspected a "true vitamin B12 deficiency" and recommended more frequent B12 shots. Tr. 466. Due to Music's asymmetrical neurological symptoms, Dr. Tani ordered an MRI of her brain and cervical spine. Tr. 466.

A brain MRI taken on July 30, 2103, showed no focal intercranial abnormality. Tr. 504. A cervical spine MRI showed mild degenerative changes throughout Music's cervical spine, including a very small broad-based central disc herniation superimposed on disc bulge at the C5-6 level. Tr. 505.

On August 5, 2013, Music returned to Dr. Tani. Tr. 467-473. She had started receiving twice-weekly B12 injections and had had three so far. Tr. 467. She had started taking CBZ (carbamazepine) which helped at first, but the previous night she had had four spasms that woke her up from sleep. Tr. 467. She described her spasms as both her arms and legs "flex up." Tr. 467, 470. The numbness and tingling in her hands and feet had improved, but not resolved, and she still had numbness and tingling around her mouth. Tr. 467. She was very fatigued and

easily exhausted by routine activity.  Tr. 467.  When she did laundry or dishes her arms felt like "Jello" afterwards.  Tr. 467.  Her neck and left arm felt sore and her left arm and leg felt weak. Tr. 467.  Exam findings were similar to her previous examination.  Tr. 471.  Her gait had improved slightly: it was mildly wide-based, her tandem gait was mildly unsteady, and she could hop very slowly and hesitantly on her left foot.  Tr. 471.  After reviewing the MRI results, Dr. Tani remarked that Music had tonic spasms suggestive of multiple sclerosis (MS), but the MRI of her brain and cervical spine showed no lesions suggestive of MS.  Tr. 473.  She noted that Music had low vitamin B12, which could also cause demyelination, and that her sensory symptoms improved with B12 shots, which suggested symptomatic vitamin B12 deficiency.  Tr. 473.  Dr. Tani expressed concern that her multiple medications may be contributing to her fatigue during the day, while remarking that Music found all her medications to be helpful.  Tr. 473.  Dr. Tani increased her carbamazepine and stopped her tizanidine at bedtime, to use only as needed for spasms waking her at night.  Tr. 473.  She also advised she continue her B12 shots. Tr. 473.  The treatment note states, "She remains unable to work due to fatigue, imbalance and unpredictable muscle spasms."  Tr. 473.

On August 26, 2013, Music had a follow up visit with Dr. Tani.  Tr. 474.  She reported having more involuntary spasms which now occurred occasionally during the day.  Tr. 474.  Her spasms were starting to feel painful.  Tr. 474.  That day she felt shaky without spasms and her neck and arms felt achy from pulled muscles.  Tr. 474.  Upon exam, her finger tapping was slower on the left than right, but she had normal coordination and muscle bulk, tone, and strength.  Tr. 478.  Light touch elicited unpleasant paresthesias in the left arm and leg and pin sensation was diminished throughout her left arm and leg.  Tr. 478.  She had a normal gait and stance, a mildly unsteady tandem gait, and she was able to hop repeatedly on her right foot and

slowly several times on her left foot.  Tr. 478.  Dr. Tani ordered further testing to rule out MS, at Music's request, and prescribed Gabapentin for her muscle spasms.  Tr. 479.

On September 27, 2013, Music followed up with Dr. Tani and reported that Gabapentin helped her spasms at night but made her sleepy during the day.  Tr. 480.  She continued to have frequent spasms in her neck and arms, tingling in her left arm and leg and around her mouth, and shooting pain in her left fourth and fifth fingers.  Tr. 480.  She felt tired all the time.  Tr. 480. Upon exam, Dr. Tani observed an episode of involuntary turning of her head to the left for a few seconds and occasional brief movement of her head or arm.  Tr. 483.  She was alert, interactive, cooperative, and had no difficulty discussing her recent medical problems and medications.  Tr. 483.  She had normal muscle tone, bulk, and strength.  Tr. 483.  She had dyesthesia with light touch of her left upper and lower extremities. Tr. 483.  Her gait was normal, her stance was stable, and she was able to perform a tandem gait and hop on either foot, although slowly on the left.  Tr. 483.  Dr. Tani remarked that her involuntary muscle spasms had improved somewhat, involving her neck and arms now and no longer her legs, and that the Gabapentin was allowing her to sleep through the night without being awoken by spasms.  Tr. 487.  The cause of her abnormal movements was unclear; testing remained negative for inflammatory markers indicative of MS.  Tr. 487.  Dr. Tani advised that Music minimize all medications that could contribute to her abnormal movements and fatigue.  Tr. 487.  She remarked that Music needed to return to work in 2 weeks or "face losing her job."  Tr. 487.  She decreased Music's Cymbalta to 30 mg, with a possibility of decreasing it to 20 mg; recommended Topamax only at bedtime; increased her Gabapentin throughout the day; and stopped two other medications, including her Tizanidine.  Tr. 487.

On October 10, 2013, Music returned to Dr. Tani for a follow-up and reported worsening

abnormal movements occurring randomly and more often when she was tired or stressed.  Tr. 488.  She had about 2-3 during the day and many more at night, up to 13.  Tr. 488.  She did not feel that the daytime dose of Gabapentin helped, but she had far fewer spells during the day.  Tr. 488.  She also cut back on her Cymbalta and experienced only a little more mid and low back pain.  Tr. 488.  She continued to have dysesthesia when touching her left arm or leg.  Tr. 488.  She remained unable to work and had lost her job.  Tr. 488.  Her exam findings were consistent with previous visits: she had no abnormal movements; her facial sensation was intact; her muscle tone, bulk and strength were intact; she had an unpleasant tingling sensation to light touch of her left upper and lower extremities; and her gait was normal, stable, she was able to perform a tandem gait, walk on heels and toes, and hop repeatedly on either foot, a little more slowly on the left than the right.  Tr. 492.  Dr. Tani commented that she did not know what was causing Music's abnormal movements and recommended she consult a movement disorder specialist.  Tr. 492.  Her diagnoses/problems were listed as common migraine, involuntary movements, and fibromyalgia.  Tr. 492.

On December 5, 2013, Music saw Dr. Gunzler, M.D., for a neurological evaluation due to complex movements.  Tr. 1071.  Music reported that they occurred mostly when she was tired or stressed and after repetitive movements.  Tr. 1071.  She detailed experiences she had had with different medications.  Tr. 1071.  She also reported chronic severe right shoulder and leg pain and that she had been diagnosed with fibromyalgia.  Tr. 1071.  Upon exam, Dr. Gunzler observed that, at one point during repetitive exertion, her right arm became abducted with elbow flexion and formation of a fist.  Tr. 1073.  Music described a desire to move preceding this occurrence.  Tr. 1073.  She was frequently tearful.  Tr. 1074.  Dr. Gunzler diagnosed involuntary movements, common migraine, and tic disorder.  Tr. 1073.  He explained that his impression was

that Music had an abrupt onset of a complex pattern of muscle spasms, which were clearly very disabling to her and happening rather frequently.  Tr. 1074.  He discussed with her possible differential diagnoses included complex tic disorder, conversion disorder, and paroxysmal dystonia.  Tr. 1074.  He recommended increasing her Guanfacine to 1 mg twice a day and, if that did not work, starting Clonazepam, Keppra, or Tetrabenazine.  Tr. 1074.  She was to return in a few months for a follow-up visit.  Tr. 1074.

On August 18, 2014, an MRI of Music's right shoulder showed a small partial thickness distal supraspinatus tendon tear without full thickness rotator cuff tear; a suspected small linear tear of the posterior superior labrum without frank detachment; and mild right-sided acromioclavicular joint arthrosis.  Tr. 1088-1089.

On September 9, 2014, Music saw rheumatologist Dr. Lumapas, M.D., as a new patient for her fibromyalgia.  Tr. 587-591.  She complained of pain in her shoulders and back, difficulty getting out of an armchair, muscle spasms, and limited ability to engage in activity.  Tr. 587.  She was not working, "Just takes care of her house [because] she has a lot of pain."  Tr. 587.  She hadn't started an exercise program because repetitions caused spasms.  Tr. 587.  She had been diagnosed with a rotator cuff tear and she didn't do any stretches.  Tr. 587.  She reported that she woke a couple times per night due to pain and usually took a nap in the afternoon.  Tr. 587.  She was tired all the time.  Tr. 588.  Upon exam, she had 5/5 strength and 18/18 tender points.  Tr. 591.  Dr. Lumapas "had a long discussion" with Music about fibromyalgia and conservative treatments.  Tr. 591.  They discussed better diet and sleep hygiene and stretches such as restorative yoga.  Tr. 591.  Dr. Lumapas declined to change her current medication regimen and recommended yoga stretches and a follow-up appointment in three months.  Tr. 591.

On October 27, 2014, Music saw Dr. Punjabi, MD, at the Center for Digestive Health, complaining of diarrhea for the past 2-3 months.  Tr. 667.  She reported no rectal bleeding but some incontinence of stools and urgency.  Tr. 667.  Her abdominal exam was normal and she had a normal gait and station.  Tr. 668-669.  Dr. Punjabi ordered a colonoscopy.  Tr. 669.

On November 10, 2014, Music returned to Dr. Lumapas for a follow up visit.  Tr. 582.  Dr. Lumapas noted that they had previously discussed restorative yoga and massage; Music reported that she "got a video and does it 4 days a week and has massage gadgets that she uses everyday."  Tr. 582.  She had not had any spasmatic movements for the last three weeks.  Tr. 582.  She reported a lot of muscle and joint pain, which she felt had worsened due to the weather.  Tr. 582.  She stated that she had difficulty rising from a seated position and pain in her knees and back.  Tr. 582.  She endorsed back pain, morning stiffness, joint swelling, myalgias, muscle weakness, arthralgias, paresthesia, headache, sleep disturbance, depression, and fatigue.  Tr. 583.  Upon exam, she had 5/5 strength in her upper and lower extremities and 18/18 tender points.  Tr. 585.  Dr. Lumapas stated that she had improvement with her spasmodic movements but she still had pain; observed that she was unable to tolerate Gabapentin at higher doses; and increased her Cymbalta.  Tr. 586.

On November 20, 2014, Music underwent right shoulder arthroscopic pan-capsular release, muscular biceps tenotomy, subacromial decompression, and extensive debridement.  Tr. 537.  At a postoperative visit she was doing well and was advised to continue physical therapy and her daily exercises.  Tr. 820.

On December 2, 2014, Music saw Dr. Punjabi for a colonoscopy.  Tr. 662-663.  The findings included moderate diverticulitis of the descending colon and sigmoid colon.  Tr. 663.  She returned for a follow up visit on December 11 and was informed that her biopsy was normal.

Tr. 658.  She reported that her diarrhea had resolved with fiber in her diet.  Tr. 658.  Her liver function test (LFT) was abnormal.[1]  Tr. 659.  She was to continue her current medications and follow up in two months.  Tr. 660.

On December 15, 2014, Music saw Dr. Lumapas for a follow-up.  Tr. 577.  She reported having a "mini stroke" and increased spasms.  Tr. 577.  She had had blood work and her LFTs were elevated.  Tr. 577.  Dr. Lumapas commented that this occurred after she had increased her Cymbalta and started Lodine.  Tr. 577.  Music stated that the Lodine helped her knee symptoms, but she discontinued it and returned to a lower dosage of Cymbalta due to concerns about her liver function.  Tr. 577.  She complained of feeling more achy, having more spasmodic movements, and pain in her knees.  Tr. 577.  Her exam was normal and she had 18/18 tender points.  Tr. 580.  Dr. Lumapas adjusted her medications, explaining that her symptoms had worsened since she decreased her medications due to concern about her liver function, and stated that she would consider a retrial of increased Cymbalta in the future.  Tr. 580.

On March 3, 2015, Music saw Dr. Lumapas for a follow-up.  Tr. 572.  She reported difficulty lifting 10 pounds.  Tr. 572.  Dr. Lumapas indicated that she had changed Music's Cymbalta to Effexor and Music stated that "it takes the edge off."  Tr. 572.  Her LFTs were still elevated.  Tr. 572.  The yoga and massage were still helping; she hadn't been having spasms.  Tr. 572.  She reported difficulty getting into her SUV due to pain in her back and hips and she still had a lot of pain in her back and hips.  Tr. 572.  She was trying to lose weight and had lost a couple of pounds.  Tr. 572.  She denied back pain, morning stiffness, localized joint pain, myalgias, muscle weakness, arthralgias, paresthesia, headaches, anxiety, depression, and fatigue.

---

[1] LFTs are blood tests that measure enzyme and protein levels in the blood and are used to diagnose and monitor liver disease or damage. *See* https://www.mayoclinic.org/tests-procedures/liver-function-tests/about/pac-20394595 (last visited 6/29/2020).

Tr. 572-573.  On examination, she had full muscle strength and 18/18 tender points.  Tr. 576.

Dr. Lumapas increased her Effexor.  Tr. 576.

On March 12, 2015, Music saw Dr. Punjabi for a follow-up visit.  Tr. 652.  She had

diarrhea secondary to Miralax, elevated LFTs, and no abdominal pains or nausea.  Tr. 652.  Her

appetite was good and she had lost twelve pounds.  Tr. 652.  Her exam findings were normal.

Tr. 653.  Dr. Punjabi continued her current medications and ordered a comprehensive metabolic

panel.  Tr. 653.

On June 2, 2015, Music had a follow-up visit with Dr. Lumapas.  Tr. 533.  Music

reported that the higher dose of Effexor helped.  Tr. 533.  She had been spasming a little bit more

because she got tendonitis.  Tr. 533.  She had gotten shots in her shoulders from her surgeon,

which helped on the right but not the left, and she reported spasms all the way down her leg.  Tr.

533.  She was still doing her stretches and massages.  Tr. 533.  She had been getting tired.  Tr.

533.  Her sleep was good.  Tr. 533.  She had difficulty remembering things.  Tr. 533.  She felt

more depressed and did not think she would go back to work; other people were making

comments and she felt like that got to her.  Tr. 533.  Upon exam, she had 5/5 strength in both

upper and lower extremities and 18/18 tender points. Tr. 536.  Dr. Lumapas stated that Music's

elevated LFTs may be due to the Cymbalta or the addition of Lodine; she continued the Effexor

and Topamax.  Tr. 536.

On August 6, 2015, Music returned to Dr. Punjabi for a follow-up, complaining of

elevated LFTs, abdominal pains, and diarrhea.  Tr. 632.  Music reported 4-5 bowel movements

per day and abdominal pains.  Tr. 632.  She had lost 20 pounds and her LFTs were gradually

decreasing.  Tr. 632.  Dr. Punjabi diagnosed diarrhea, rule out inflammatory bowel disease and

irritable bowel syndrome; abdominal pain; diverticulosis of large intestine; and abnormal LFTs. Tr. 634.

On September 2, 2015, Music saw Dr. Lumapas for a follow-up visit.  Tr. 562.  She reported a lot of pain all over, pain in her right hip that made her cry when she pushed it, pain with walking, and a lot of fatigue.  Tr. 562.  Her left shoulder was frozen and she stated that she thought she would have to have surgery on it.  Tr. 562.  Upon exam, she had full strength, 18/18 tender points, and a decreased range of motion in her left shoulder.  Tr. 566.  Dr. Lamapas tapered her off Effexor and started her on Savella.  Tr. 566.

On September 25, 2015, Music underwent left shoulder surgery: pancapsular release, biceps tenotomy, subacromial decompression with acromioplasty, and extensive debridement. Tr. 601.

On October 21, 2015, Music reported at her occupational therapy session that things had been good and she was just a little tight and sore during activity.  Tr. 728.  On October 28, 2015, Music told her occupational therapist that she was not doing too well that day because her fibromyalgia was flaring up.  Tr. 727.  It had started three days prior.  Tr. 727.  Her pain was 10/10 at rest and with activity.  Tr. 727.  Her active range of motion continued to improve and her shoulder felt less sore after her session and ice helped with pain.  Tr. 727.

On December 8, 2015, Music saw Dr. Lumapas for a follow-up visit and reported hurting all over.  Tr. 765.  Her hands had been hurting and swelling and she had more tingling in her hands and feet.  Tr. 765.  The Savella had not really helped; Dr. Lumapas had also started her on Pristiq, which "just takes the edge off."  Tr. 765.  She had started antibiotics the day before for a sinus infection.  Tr. 765.  Upon exam, she appeared tired and tearful at times.  Tr. 768.  She had 18/18 tender points.  Tr. 768.  She had a decreased range of motion in her left shoulder but it was

11

improving.  Tr. 768.  She did not have swelling in her hands.  Tr. 770.  Dr. Lumapas increased her Pristiq and ordered blood work.  Tr. 770.

On March 8, 2016, Music returned to Dr. Lumapas for a follow-up.  Tr. 760.  The increased Pristiq had not made a significant difference.  Tr. 760.  She complained of a lot of pain in her hands, tingling in her hands and fingers, a lot of fatigue, and difficulty ambulating.  Tr. 760.  Upon exam, she appeared tired, had 18/18 tender points, and a decreased range of motion in her left shoulder.  Tr. 763.  Dr. Lumapas stated that they would retry Cymbalta, avoid NSAIDS, and monitor her LFTs.  Tr. 764.

On March 31 and April 12, 2016, Music had cortisone injections in her left shoulder.  Tr. 790-793.

On June 14, 2016, Music had a follow-up visit with Dr. Lumapas, reporting that she was feeling better with the weather.  Tr. 754.  She stated that she "did over do it and was shopping and was out with her husband"; as a result, she was in a lot of pain for two weeks but "better now."  Tr. 754.  The Cymbalta was helping and her mood "is doing okay."  Tr. 754.  She reported that her recent shoulder injection had helped.  Tr. 754.  Upon exam, she appeared tired, had 18/18 tender points, and reduced range of motion in her shoulder.  Tr. 758.  Dr. Lumapas remarked, "patient has been better on Cymbalta" and ordered an LFT.  Tr. 758.  The next day, Dr. Lumapas reviewed the results of her LFT and commented, "not too bad, continue with the Cymbalta."  Tr. 773.

On September 14, 2016, Music saw Dr. Lumapas for a follow-up visit, complaining of constant pain in her hips and shoulders, feeling tired every day and taking afternoon naps, being really depressed, and stating that, any time she tried to do anything, she hurt and became depressed about it.  Tr. 749.  Upon exam, she was tired, had 18/18 trigger points, and tenderness

in her bilateral shoulders and trochanteric bursas.  Tr. 752.  Dr. Lumapas diagnosed

fibromyalgia, subacromial bursitis, and greater trochanteric bursitis of both hips.  Tr. 752-753.

Dr. Lumapas increased her Cymbalta and injected her shoulders and hips.  Tr. 753.

On December 7, 2016, Music followed up with Dr. Lumapas, reporting that she had a

couple of flare ups the past month: after sitting in the dentist chair for two hours and after she

went to Texas and did a lot of walking.  Tr. 743.  The injections in her shoulders had "really

helped."  Tr. 743.  Her hips were starting to hurt "a little bit."  Tr. 743.  Upon exam, she had

10/18 tender points and no shoulder tenderness.  Tr. 747.  Dr. Lamapas concluded that she was

"doing well back on Cymbalta" and advised she return in six months or as needed.  Tr. 747.

On January 18, 2017, Music returned to Dr. Lumapas for injections in her trochanteric

bursa and bilateral shoulders.  Tr. 738.  Upon exam, she had 10/18 tender points and tenderness

in her shoulders, greater on the left.  Tr. 741.

On June 6, 2017, Music saw Dr. Lamapas and reported that "she has been doing about

the same."  Tr. 964.  She thought that she was having more neck and shoulder issues and her hip

started bothering her a month ago.  Tr. 964.  Upon exam, she had 10/18 tender points and

tenderness in her trochanteric bursa, bilaterally.  Tr. 967.  Dr. Lumapas diagnosed fibromyalgia

and greater trochanteric bursitis of both hips, gave her bilateral trochanteric bursitis injections,

and continued her Cymbalta and Topamax for fibromyalgia.  Tr. 967-968.

On July 20, 2017, Music had a neurological evaluation with Dr. Hussain, M.D.  Tr. 1017.

She complained of numbness in her left arm, left ankle, and foot; back pain; an episode of

diarrhea; and bluish discoloration of her left lower extremity.  Tr. 1017.  She endorsed feeling

tired, diarrhea and constipation, incontinence, myalgias, joint stiffness, muscle weakness, back

pain, limb pain, headaches, tingling, numbness, limb weakness, depression, and anxiety.  Tr.

1017.  She denied difficulty ambulating, joint or limb swelling, confusion, memory problems, and sleep disturbances.  Tr. 1017.  She had a normal attention span, ability to concentrate, and memory.  Tr. 1020.  She had normal muscle tone, bulk, and strength, and no abnormal movements.  Tr. 1020.  She had a normal gait, a stable stance, and normal sensation.  Tr. 1020.  She had a positive left Tinel's sign at the left ulnar nerve at her elbow.  Tr. 1020.  Dr. Hussain reviewed her lab results and opined that her diagnosis was" not clear at this time.  Possible small fiber neuropathy."  Tr. 1025.  He ordered more tests.  Tr. 1024-1025.

On October 10, 2017, Music had a follow-up appointment with Dr. Lamapas.  Tr. 953.  She reported that her bilateral trochanteric bursa injection was not very effective for her symptoms.  Tr. 953.  She felt that she had increased numbness on her left side.  Tr. 953.  She had difficulty sleeping at night due to discomfort, she napped during the day, and her toes turned purple at times and she had episodes where her fingers turned white.  Tr. 953.  Dr. Lamapas stated that these symptoms were not consistent with Raynaud's.  Tr. 953.  Upon exam, she had 10/18 tender points, no swelling, tenderness in her proximal upper extremity, decreased range of motion of her cervical spine, mild kyphosis of her thoracic spine, and paraspinal lumbar tenderness.  Tr. 957.  Dr. Lamapas continued her Cymbalta and Topamax.  Tr. 963.  She felt that Music's symptoms in her bursas may be coming from her back rather than her bursas.  Tr. 963.

On November 1, 2017, Music completed a questionnaire titled Modified Oswestry Low Back Pain Disability Index in conjunction with a physical therapy evaluation.  Tr. 998, 1000.  She indicated that she could tolerate the pain she has without taking pain medication and that she can take care of herself normally but that it increases her pain.  Tr. 1000.  She said she could not stand for more than 15 minutes, sit for more than 30 minutes, walk for more than a quarter of a

mile, lift only very light weights, and could not travel for more than 45 minutes.  Tr. 1000.  Pain prevented her from going out socially.  Tr. 1000.

She reported during her initial evaluation that her pain was currently 7/10, 9/10 at worst, 3/10 at best, and 5-6/10 on average.  Tr. 996.  The pain was in her back, buttock, and hips, and she had left-sided numbness from the anterior thigh to her toes and occasional sharp right lower extremity pain.  Tr. 996.  X-rays showed a slipped disc.  Tr. 996.  She reported modifying and completing housework over time with breaks and that pain interrupted her sleep.  Tr. 996.  Objective findings included decreased flexibility, core strength, and bilateral lower extremity strength.  Tr. 997, 999.  She had mild scoliosis, rounded shoulders, and an antalgic gait (limping).  Tr. 997.  Her diagnoses were degenerative arthritis of the lumbar spine and generalized muscle weakness.  Tr. 998.  Her prognosis was excellent.  Tr. 999.

Physical therapy notes at the end of November showed appropriate progress towards her goals of improved range of motion, strength, and flexibility, and she was noted to be compliant.  Tr. 983.  Her fibromyalgia pain was rated 9/10.  Tr. 983.  Her hip strength ranged from 4-/5 to 4+/5 and her gait was described as "lateral sway."  Tr. 984.  She stopped physical therapy due to changes in her insurance (Tr. 986) and was recertified for additional physical therapy on February 1, 2018.  Tr. 998.

On March 5, 2018, Music saw Dr. Baker-Horn, D.O., and reported that her right hip pain was doing much better.  Tr. 1058.  She was on Meloxicam; she had tried going off it and taking Aleve instead, but this did not provide as much relief.  Tr. 1058.  She also reported improvement in the pain and swelling in her hands.  Tr. 1058.  She denied numbness or tingling.  Tr. 1058.  Upon exam, she had normal gait and station, normal muscle strength and tone, some slight pain with internal and external rotation of her right hip that was significantly improved from her prior

exam, and tenderness to palpation over her right iliotibial band.  Tr. 1062.  Her diagnoses included osteoarthritis, multiple sites, and hip pain.  Tr. 1062.

On April 10, 2018, Music saw Dr. Lumapas for a follow up visit, complaining of pain in her hands, knees, and feet, and swelling in her feet, ankles, and lower legs.  Tr. 1052.  She reported that she had gone on a cruise.  Tr. 1052.  She had swelling in her feet and hands before she went on the cruise and it took three days to go down after she had come home.  Tr. 1052.  She reported difficulty standing and walking.  Tr. 1052.  She could not put the recliner end down.  Tr. 1052.  The Meloxicam helped her hip pain.  Tr. 1052.  Upon exam, she had 10/18 tender points and mild edema in her feet.  Tr. 1056.  Dr. Lumapas continued her medications and ordered bloodwork.  Tr. 1057.

On June 18, 2018, Music saw a physician's assistant as a new patient to establish care.  Tr. 1029, 1035.  Her chief complaints were low back pain and diarrhea.  Tr. 1029.  She stated that her lower back pain started four years earlier and was getting worse.  It was painful with movements and physical activities and better with rest and lying on her stomach.  Tr. 1029.  The pain radiated to the right buttock.  Tr. 1029.  Physical therapy and pain relievers did not improve her symptoms.  Tr. 1029.  She stated that her diarrhea has been ongoing for a year and that, prior to diarrhea, she had had constipation for two years.  Tr. 1029.  She denied abdominal pain, bloating, and headaches.  Tr. 1029.  Upon exam, she had full muscle strength and range of motion in all extremities, no joint swelling, and a normal abdominal exam.  Tr. 1032.  It was recommended she exercise 30 minutes a day.  Tr. 1034.

### C. Opinion Evidence

#### 1. Treating Physician

On March 15, 2017, Dr. Lumapas completed a medical source statement on behalf of

Music.  Tr. 939-942.  She stated that she had been seeing Music every 1-3 months since her initial visit on September 9, 2014.  Tr. 939.  She had been treating her for trochanteric bursitis, fibromyalgia, and shoulder pain.  Tr. 939.  She opined that Music's symptoms would likely be severe enough to interfere with the attention and concentration needed to perform even simple work-related tasks for more than 25% of the workday and that, if she tried to work full-time, she would likely be absent more than four days per month.  Tr. 939.  She did not offer an opinion regarding Music's lifting and carrying capabilities or her ability to use her hands and feet, stating that a formal functional capacity test had not been performed.  Tr. 940, 941.  She opined that Music could sit up to 4 hours in an 8-hour workday, stand/walk 1 hour each in an 8-hour workday, and required a sit/stand option at will.  Tr. 940.  In support of that assessment, Dr. Lumapas cited Music's widespread pain, tender points, and adhesive capsulitis.  Tr. 940.  She did not need a cane to ambulate effectively but required a wheelchair during family outings; she could ambulate less than 200 feet without one.  Tr. 940-941.  She could never climb ladders or scaffolds, stoop, kneel, crouch, or crawl.  Tr. 941-942.  She could rarely balance, climb stairs or ramps, and rotate her head and neck.  Tr. 941-942.  She did not cite reasons for these postural limitations.  Tr. 942.

### 2. Consultative Examiner

On August 26, 2015, Music saw psychological consultative examiner Dr. Whitlow, Ph.D. Tr. 550-556.  Asked why she was applying for disability befits, Music cited her fibromyalgia, which rendered her unable to stand or sit too long because of pain, muscle spasms, and frozen shoulder syndrome.  Tr. 551.  She stated that she also gets "fibro-fog really bad," affecting her memory.  Tr. 551.  Dr. Whitlow observed that Music had been standing in the waiting room and had to stand up and move around several times during the evaluation due to pain from sitting.

Tr. 553.  During the cognitive portion of the exam, she had a very difficult time thinking of answers, getting her thoughts straight, and clearly communicating her answers without getting extremely tongue-tied.  Tr. 553.  Dr. Whitlow concluded that Music did not have a mental health condition, but a physical condition, and that she was therefore unable to develop a prognosis regarding her condition.  Tr. 554.  Answering each question posed regarding Music's functional assessment, Dr. Whitlow stated, "From a mental health perspective, the claimant does not appear to have limitations on this functional assessment area."  Tr. 556.

### 3. State Agency Reviewing Physicians

On September 3, 2015, state agency reviewing physician Dr. McKee, M.D., reviewed Music's record and opined that she can perform light work (stand/walk/sit 6 hours a day, lift 20 pounds occasionally and 10 pounds frequently) with postural limitations and no exposure to hazards.  Tr. 180-181.  On January 1, 2016, state agency reviewing physician Dr. Bolz, M.D., agreed with Dr. McKee and added that Music is limited to occasional overhead reaching.  Tr. 195-197.

### D. Testimonial Evidence

#### 1. Music's Testimony

Music was represented by counsel and testified at both administrative hearings.  Tr. 136, 155.

May 3, 2017, Hearing: When asked what occurred on her alleged disability onset date, Music stated that it was the day after she had done an obstacle course and was having muscle spasms.  Tr. 156.  The obstacle course was called the "Dirty Girl Run" and involved crawling through mud and going over obstacles.  Tr. 157.  She had fibromyalgia and her doctor had told her to exercise.  Tr. 157.  After the event she went to the doctor and was put on medical leave

and told she could not go back to work.  Tr. 156.  She saw a neurologist, who could not find anything to explain her symptoms, and her rheumatologist, who told her she thought it was her fibromyalgia and instructed her to do restorative yoga, which seemed to help her spasms.  Tr. 156-157.  Her rheumatologist told her that going through menopause makes some women's fibromyalgia symptoms better and some women's worse, and hers had worsened.  Tr. 157.

Music described an average day at the time of her alleged onset: she wakes up in the morning, drinks coffee, and, if there are dishes in the sink, she will do some dishes a little at a time because she cannot stand too long.  Tr. 157.  Too long is 10-15 minutes.  Tr. 157.  She loads and unloads the dishwater.  Tr. 157.  Sometimes, if she is having a bad day and pushes herself too hard, she has to lie on the floor due to pain until her pain goes away.  Tr. 157.  After she does dishes, she sits and watches television, usually takes a 3-hour nap around 2:00 pm, and then she will clean the house a little bit at a time and watch more television.  Tr. 158.  She cooks, makes the evening meal, and also does the laundry.  Tr. 158.  Her son and daughter live with her and they help out with housework a lot.  Tr. 158.  She does yoga about 2-3 times a week.  Tr. 158.  She will play games on her iPad, but she can't play them too long or she'll get spasms.  Tr. 158.  She used to enjoy restoring furniture but can no longer do it because she'll get spasms.  Tr. 158.

Music testified that, during the hearing, she was in pain and rated her pain 5/10.  Tr. 159.  She takes Cymbalta and Topamax, which numbs the pain.  Tr. 159.  She had had frozen shoulders, underwent surgery, and "they're good now."  Tr. 159.  They still hurt.  Tr. 159.  She can raise both arms over her head.  Tr. 159.  She was seeing a psychiatrist due to depression from not working and weight gain, but she stopped going because she couldn't afford it.  Tr. 159-160.  She is not on mental health medication.  Tr. 160.  She used to have headaches but no longer gets them since she has been taking Topamax.  Tr. 160.  She stated that her joints do not swell, they

just hurt badly.  Tr. 161.  For example, it hurts when her granddaughter tries to climb up on top of her shins.  Tr. 161.  When this happens, the shins on both her legs hurt, as well as her hips. Tr. 160.  The pain radiates out and her whole side hurts.  Tr. 161.

When Music is having a bad day, her pain is 10/10, she stays in bed, she can't leave the house, and she can't do any household chores.  Tr. 162, 163.  She has bad days sporadically; she may have three bad days, or a week of bad days, or a month of good days and then a month of bad days.  Tr. 162.

July 16, 2018, Hearing: Music reiterated that she became disabled in July 2013 because she started having muscle spasms from her fibromyalgia.  Tr. 137.  Her muscles would get tense due to stress and pain and spasm.  Tr. 137.  She still gets muscle spasms when she does repetitive things or gets stressed out.  Tr. 137.  Her doctors recommended she do restorative yoga and she does it every day.  Tr. 138.  She described a typical day the same as at her prior hearing.  Tr. 139. She spends a lot of time in a recliner because she is in so much pain in her back and legs; her legs hurt when her cat walks on them.  Tr. 139.  The day of the hearing, Music rated her pain a 6/10.  Tr. 139.

Music testified that she can only stand 15-20 minutes at a time before she needs to sit down.  Tr. 140.  She can sit for 10 minutes in a hard chair and in a more comfortable chair, like the one at the hearing, she can sit for 15-20 minutes, maybe longer.  Tr. 140.  She has difficulty walking long distances and, if she goes somewhere, she has to use a wheelchair or a walker.  Tr. 140.  Her husband drove her to the hearing and she did not have difficulty walking to the hearing site from where he dropped her off.  Tr. 141.  She can't lift anything over 20 pounds because of sharp pain in her shoulders.  Tr. 141.  She can lift her arms above her head and reach in front of

her but it hurts.  Tr. 141-142.  When she bends over she has back pain.  Tr. 142.  She has been
getting injections in her back.  Tr. 142.

When asked if she has a hard time maintaining attention on a particular task for a long
period of time, Music stated that she does.  Tr. 143.  She often has a hard time thinking about
words.  Tr. 143.  She will be trying to talk to someone to explain something to them but she can't
think of the words, even when it is something simple.  Tr. 143.  She has had this problem since
she has had fibromyalgia and her doctor told her it was "fibro fog."  Tr. 143.  She also testified
that cold weather bothers her a lot, and that warm weather really helps with her pain.  Tr. 144.

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearings.  At the second hearing, the ALJ
discussed with the VE Music's past work as an x-ray technician.  Tr. 145.  The ALJ asked the
VE to determine whether a hypothetical individual of Music's age, education and work
experience could perform her past work or any other work if that person had the limitations that
were subsequently assessed in the ALJ's RFC determination, and the VE answered that such an
individual could not perform Music's past work but could perform the following jobs with
significant numbers in the national economy: electronics worker, mail clerk, and assembler of
printed products.  Tr. 145-147.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the
existence of a disability.  "Disability" is defined as the "inability to engage in any substantial
gainful activity by reason of any medically determinable physical or mental impairment which
can be expected to result in death or which has lasted or can be expected to last for a continuous
period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.     If claimant is doing substantial gainful activity, he is not disabled.

2.     If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.     If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.     If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.     If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

---

[2] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 *et seq.*  The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq.*, corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his July 19, 2018, decision, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2019.  Tr. 119.

2. The claimant has not engaged in substantial gainful activity since July 26, 2013, the alleged onset date.  Tr. 119.

3. The claimant has the following severe impairments: fibromyalgia, migraines, and obesity.  Tr. 119.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 120.

5. The claimant has the residual functional capacity to perform less than the full range of light work as defined in 20 CFR 404.1567(b).  Specifically, she can occasionally lift 20 pounds and frequently lift 10 pounds.  She can stand/walk for 4 hours of an 8-hour workday and sit for 6 hours of an 8-hour workday.  She has no limit on push/pull or foot pedals.  She can frequently climb ramps/stairs, but never climb ladders, ropes, or scaffolds.  She can frequently balance.  She can constantly stoop, kneel, crouch, and crawl.  She can occasionally reach overhead bilaterally and all other planes are constant. She has no visual or communication limitations.  She should avoid high concentrations of cold.  She should avoid entirely dangerous machinery and unprotected heights.  She can do simple, routine tasks, but no complex tasks.  Tasks should not involve high production quotas, piece rate work, arbitration, negotiation, supervision, or commercial driving.  Tr. 120.

6. The claimant is unable to perform her past relevant work as a radiologic technologist. Tr. 126.

7. The claimant was born in 1968 and was 45 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 127.

8. The claimant has at least a high school education and is able to communicate in English. Tr. 127.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills.  Tr. 127.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are other jobs that exist in significant numbers in the national economy that the claimant can also perform.  Tr. 127.

11. The claimant has not been under a disability, as defined in the Social Security Act, from July 26, 2013, through the date of this decision.

### V. Plaintiff's Arguments

Music argues that the ALJ violated the treating physician rule when assigning weight to Dr. Lumapas' opinion and that the ALJ's credibility assessment is not supported by substantial evidence.  Doc. 16, pp. 19-35.

### VI. Legal Standard

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### VII. Analysis

#### A. The ALJ did not violate the treating physician rule

Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and

24

laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2).  If an ALJ decides to give a treating source's opinion less than controlling weight, she must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *Wilson*, 378 F.3d at 544.  In deciding the weight given, the ALJ must consider factors such as the length, nature, and extent of the treatment relationship; specialization of the physician; the supportability of the opinion; and the consistency of the opinion with the record as a whole.  *See* 20 C.F.R. § 416.927(c); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 747 (6th Cir. 2007).

Music argues that the ALJ violated the treating physician rule because he failed to give good reasons for assigning "no weight" to Dr. Lumapas' opinion.  Doc. 16, pp. 18-28.  The ALJ considered Dr. Lumapas' opinion as follows:

> On March 15, 2017, Dr. Lumapas completed a form about the claimant's physical capabilities.  Dr. Lumapas provided diagnoses of fibromyalgia, trochanteric bursitis, and shoulder pain.  Dr. Lumapas opined that the claimant's symptoms are severe enough to interfere with the attention and concentration needed to perform "even simple work related tasks" and the claimant will be off task more than 25% of a workday; she will be absent from work more than four times per month due to impairments or treatment; she can sit for four hours of an 8-hour workday, stand for one hour, and walk for one hour, and she needs a sit/stand option "at will," all due to widespread pain, tender points, and adhesive capsulitis; she "requires" a wheelchair during "family outings"; and performing postural activities range from "never" to "rarely" (16F:3-6).

> I give no weight to Dr. Lumapas's opinion for several reasons.  A review of the treatment notes (8F; 13F; 17F) fails to show that the claimant complained to Dr. Lumapas about decreased attention or concentration and on the form, Dr. Lumapas did not provide an explanation or relevant evidence to support her opinion of more than 25% off-task.  As for the absenteeism rate, she did not provide an explanation or relevant evidence on the form to support her opinion and it is not consistent with the limited course of treatment.  I give no weight to the sitting/standing/walking limitations, or need for an "at will" sit/stand option—while the medical evidence or record shows widespread pain, tender points, and tenderness of the shoulders and hips, the medical evidence of record also

shows 5/5 strength throughout (see above).  Furthermore, it is not consistent with the limited course of treatment or Dr. Lumapas's notations that Cymbalta helps.  Lastly, the record does not support medical necessity for a wheelchair.

Tr. 125-126.

Music first argues that the ALJ "gave no obvious consideration to the regulation that provides the opinions of treating sources are generally entitled to more weight 'since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations…'"  Doc. 16, p. 21 (quoting C.F.R. § 404.1527(c)(2)).  She does not cite legal authority requiring an ALJ to name the regulation pertaining to a treating physician opinion in a decision.  The ALJ's failure to cite CFR § 404.1527 is not error.  Music also points out that Dr. Lumapas is a rheumatologist, which, she asserts, supports giving her opinion more weight.  Doc. 16, p. 21.  The ALJ recognized that Dr. Lumapas is a rheumatologist, Tr. 122; thus, to the extent Music contends that the ALJ overlooked that fact, the ALJ did not overlook it.

Music contends that the ALJ's reasons for giving "no weight" to Dr. Lumapas' opinion were "factually inaccurate and legally insufficient."  Doc. 16, p. 22.  Although she concedes that CFR § 404.1527(c)(3)&(4) requires an ALJ to consider the supportability and consistency of an opinion, she asserts that the ALJ "play[ed] doctor" when he found that Dr. Lumapas' opinion was "inconsistent with *her own treatment notes*."  Doc. 16, p. 23 (emphasis in original).  However, considering whether an opinion is supported by the opining doctor's own treatment notes is appropriate under the regulations.  *See* CFR § 404.1527(c)(3) ("Supportability.  The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion."),

404.1527(c)(4) ("Consistency. Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion."); *Rottmann v. Comm'r of Soc. Sec.*, -- Fed. App'x --, 2020 WL 3397744, at *2 (6th Cir. June 19, 2020) (the ALJ properly considered whether a treating physician's opinion is supported by the physician's own treatment notes).  The ALJ accurately stated that Dr. Lumapas' treatment notes did not indicate that Music complained to her about decreased attention and concentration and that her form opinion did not explain why she believed that Music would be off task more than 25% of a workday due to problems with attention and concentration.  The ALJ's statements are factually accurate.  They are not evidence that the ALJ "played doctor," nor are they legally insufficient.  Music's theoretical musings regarding what percentage of "consistent" or "supported" the regulation intends (Doc. 16, pp. 23-24) and how a physician could be expected to offer a prospective opinion regarding work limitations (Doc. 16, pp. 26-27) do not establish an error by the ALJ.[3]

Music asks the Court to consider "references to symptoms that would undoubtedly interfere with attention and concentration" and posits that pain impacts concentration.  Doc. 16, p. 26.  She also argues, "[t]here can be no dispute that episodes of diarrhea lasting all day or 4-5 times a day would impact her attention, concentration, and attendance.  Yet, the ALJ gave no obvious consideration to this evidence while weighing the opinion of Dr. Lumapas."  Doc. 16, p. 26.  Again, the issue here is that Dr. Lumapas' treatment notes did not reference Music having difficulty with attention and concentration.  *See Golden v. Berryhill*, No. 1:18-CV-00636, 2018 WL 7079506, at *14 (N.D. Ohio Dec. 12, 2018) ("Contrary to Golden's argument, the ALJ was

---

[3]  The ALJ credited Music's testimony that she has "fibro-fog" that makes it difficult for her to find words while she is speaking.  Tr. 126.  Based on Music's testimony, the ALJ limited her to simple, routine tasks and no high production quotas, piece rate work, arbitration, confrontation, negotiation, supervision, or commercial driving.  Tr. 126.

27

not rejecting Dr. Balaji's opinion because there was no objective evidence to support it, but because the doctor himself provided no support for his conclusions.").

Music invites the Court to do an end-run around the ALJ's reasons for discounting Dr. Lumapas' opinion, asserting, "When viewed in this (correct) light, the record is replete with evidence of fibromyalgia signs and symptoms consistent with Dr. Lumapas' opinion." Doc. 16, p. 21. She then goes on to detail evidence in the record showing that she suffered from widespread pain and that she had 18/18 tender points. Doc. 16, p. 21. First, the Court does not reweigh the evidence, which is what Music is asking this Court to do. *Garner*, 745 F.2d at 387; *Dyson v. Comm'r of Soc. Sec.*, 786 F. App'x 586, 588 (6th Cir. 2019). Moreover, the ALJ acknowledged that the record showed Music to have widespread pain and 18/18 tender points. Tr. 123, 125, 126. The ALJ also detailed the record evidence showing that Cymbalta helped Music's symptoms; that with an increased dose of Cymbalta she routinely had 10/18 trigger points, not 18/18 trigger points; she maintained 5/5 strength and a normal gait; and she received regular, but not frequent, medical care for her condition, citing Dr. Lumapas' instructions (in June 2016, December 2016, June 2017, October 2017, and April 2018) that she return for a follow up visit every six months.[4] Tr. 124-125. *See Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 631 (6th Cir. 2016) (the fact that the claimant received conservative treatment is a "good reason" for discounting a treating source opinion.); *Wreede v. Comm'r of Soc. Sec.*, 2019 WL 1324024, at *16 (N.D. Ohio, March 25, 2019) (routine office visits amounts to conservative treatment and is a "good reason" supporting the ALJ's decision to discount a treating source opinion).

Music calls the ALJ's characterization of her treatment "limited" and his finding that

---

[4] In June 2017, Dr. Lumapas instructed Music to return in four to six months, a fact the ALJ noted. Tr. 124.

"Cymbalta helps" to be "a gross mischaracterization of the records."  Doc. 16, p. 27.  The Court disagrees.  As noted, the ALJ discussed the longitudinal treatment Music had with Dr. Lumapas and other providers, including the following: Cymbalta had helped her symptoms early on; Music had a Vitamin B12 deficiency that required treatment (Tr. 122) and she underwent two shoulder surgeries (Tr. 123); Dr. Lumapas increased her Cymbalta but then decreased it when she experienced elevated LFTs; Dr. Lumapas tried switching her from Cymbalta to other medications that were not as effective; Dr. Lumapas put her back on a low dose of Cymbalta, which she tolerated and which, she stated, helped; Dr. Lumapas thereafter increased her Cymbalta dose, stated she was doing well on it; and, thereafter, Music had 10/18 tender points and was instructed to continue her medications and return for follow-up visits every six months. Tr. 124-125.  Music told Dr. Lumapas (and stated at the hearing, Tr. 159) that Cymbalta helps. The ALJ's conclusion that Cymbalta helps is not a mischaracterization of the record.  And it is accurate to call Dr. Lumapas' instructions to return in six months regular, but not frequent, treatment.

Music also identifies her subjective complaints regarding her ability to sit, stand, and walk, as well as "repeated manifestations of co-occurring conditions" such as her complaints of fatigue, depression, and diarrhea and constipation, as consistent with Dr. Lumapas' opinion. Doc. 16, p. 25.  However, the ALJ did not find Music's subjective complaints regarding her limitations to be entirely consistent with the record evidence, as discussed below in the next section.

### B. The ALJ did not err when assessing Music's statements regarding her symptoms

To evaluate the credibility of a claimant's symptoms, an ALJ considers the claimant's complaints along with factors such as the objective medical evidence, treating or nontreating

source statements, treatment received, and other evidence.  20 C.F.R. § 404.1529(c); SSR 16-3p, 2017 WL 5180304.  The ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."  *Id*. at *4.

Music argues that, regarding her activities of daily living, she testified that she performs limited household chores for short periods of time, takes a nap and spends time watching television, sometimes has pain levels reaching 10/10, and endures stretches of time in which she has bad days.  Doc. 16, p. 30.  She also repeatedly stated that her ability to sit, stand, and walk were limited and that her symptoms affected her ability to sleep and engage in social and leisure activities.  Doc. 16, pp. 30-31.  The ALJ considered these statements, as well as her statement that she needs to use a walker or wheelchair if she "goes any distance."  Tr. 121.  The ALJ found Music's pain/symptoms not to be as severe as she alleged.  Tr. 125.  The ALJ commented that Music had full muscle strength in all extremities, walked with a normal gait, and received regular, but not frequent, treatment.  Tr. 125.  He also observed that the record did not support the need for a wheelchair.  Tr. 126.  This is an adequate explanation containing specific reasons for the weight the ALJ gave to Music's statements regarding her symptoms.  *See* SSR 16-3p, 2017 WL 5180304, at *4.

Music asserts, "While [the ALJ] arguably gave some consideration to the impact of standing and walking by limiting her to 4 hours in an 8-hour workday, neither his RFC or the discussion in support of it offers any indication that he considered the impact of sustained work activity, i.e. 8 hours a day, 5 days a week, the impact of prolonged sitting, or the impact of fatigue on her ability to perform this work activity on a regular and continuing basis."  Doc. 16,

30

p. 32.  As Music concedes, the ALJ considered her ability to stand and walk and he assessed her ability to perform work activity on a regular and continuing basis.  In fact, the ALJ found Music to be more limited than the state agency reviewers did, limiting her to four hours of standing and walking instead of six, and accounted for her inability to perform constant overhead reaching by limiting her to occasional overhead reaching.  Tr. 125.

Music cites SSR 16-3, stating, "[p]ersistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments, referrals to specialists, or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent."  Doc. 16, p. 33.  She submits that the record supports her persistent attempts: medication adjustments, specialists, and unsuccessful treatment such as shoulder surgeries and injections.  Tr. 16, p. 33.  While Music's medications were adjusted due to elevated LFTs, the record shows that she ultimately was able to tolerate an appropriate dose of Cymbalta, which helped her symptoms.  She did see specialists, which the ALJ noted, but, as the ALJ also noted, she was advised to consult a movement disorder specialist and did not do so.  Tr. 122.  She testified that her shoulder surgeries were helpful, Tr. 159, as were her shoulder injections, as the record shows.  Tr. 743.  And the ALJ remarked that, throughout her treatment with Dr. Lumapas, Dr. Lumapas recommended restorative yoga, a conservative treatment.  Tr. 122-123, 125.

Music asserts that the ALJ failed to acknowledge her digestive symptoms and, "critically, offered little, if any, insight into how her … digestive symptoms factored into his ultimate findings."  Doc. 16, p. 31.  However, Music herself did not state how or whether her digestive symptoms limited her.  She didn't mention these symptoms at the hearing or identify them as a reason she was unable to perform work.  Nor did any medical opinion indicate that these

symptoms caused any functional work-related limitations.  The ALJ did not err by not including limitations in his RFC for digestive symptoms when there was no evidence in the record indicating how these symptoms impaired her ability to perform work.  As for her fatigue, which Music also alleges that the ALJ failed to account for in his RFC, the ALJ recognized that she complained of fatigue.  Tr. 122, 124.  In short, the ALJ considered Music's fatigue and other symptoms and, ultimately, found her symptoms less severe than alleged.  Tr. 125.

Finally, Music's assertion that the ALJ should have had a medical expert testify at the hearing or re-contacted Dr. Lumapas for "clarification" is without merit, as the ALJ is not required to do either of these things.  *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 726 (6th Cir. 2013) ("The ALJ was not required to obtain a medical expert to interpret the medical evidence related to his physical impairments.  In fact, the regulations require the ALJ to evaluate the medical evidence to determine whether a claimant is disabled.").

In sum, Music's challenges to the ALJ's decision are without merit.  The ALJ did not run afoul of the regulations and substantial evidence in the record supports his decision.  It should, therefore, be affirmed.  *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) (the Commissioner's decision is upheld so long as substantial evidence supports the ALJ's conclusion).

## VIII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **AFFIRMED**.


IT IS SO ORDERED.

Dated: June 29, 2020

*/s/ Kathleen B. Burke*
_____
Kathleen B. Burke
United States Magistrate Judge